**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re**: | § | |
| | § | |
| ***ROOTED ENTERPRISE, LLC*** | § | |
| | § | **Case No. (26-33356-11)** |
| **Debtor.** | § | |

**DECLARATION OF STEPHANIE SHOEMAKE IN SUPPORT OF DEBTOR'S MOTION FOR AUTHORITY TO USE CASH COLLATERAL**

I, Stephanie Shoemake, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge, information, and belief:

## I. BACKGROUND AND QUALIFICATIONS

1. I am the Managing Member of Rooted Enterprise, LLC (the **"Debtor"**), the above-captioned debtor and debtor-in-possession. I have served in this capacity since the Debtor's formation on June 16, 2021. I am authorized to submit this Declaration on behalf of the Debtor.

2. I submit this Declaration in support of the Debtor's Motion for Authority to Use Cash Collateral Pursuant to 11 U.S.C. §§ 363 and 105 (the **"Motion"**), filed on or about June 1, 2026 [Doc. 12].

3. I have personal knowledge of the facts set forth in this Declaration, or have obtained knowledge of such facts through my review of the Debtor's books, records, and other business information. If called upon to testify, I could and would testify competently to each of the facts set forth herein. I have reviewed the proposed cash collateral budget attached as Exhibit “A” to the Motion and believe it accurately reflects the Debtor's projected income and expenses during the applicable period.

## II. OVERVIEW OF THE DEBTOR'S BUSINESS AND PROPERTY

4. The Debtor was organized as a Texas limited liability company on June 16, 2021. Its principal asset is a commercial building containing approximately 12,359 square feet located at 2775 Barron Road, College Station, Texas 77845 (the "**Property**"). The Property was purpose-built for use as a childcare and early-education facility.

5. The Debtor is co-owned equally by me and my husband, Steve Shoemake. The Debtor's sole business is the ownership and leasing of the Property.

6. The Property is leased to BCS Peas in a Pod Learning Center, LLC ("**PIAP**"), a Texas limited liability company that operates a childcare and early-education center at the Property. PIAP is the Debtor's sole tenant. I am also the sole owner of PIAP.

7. PIAP began occupying the Property on or about June 3, 2024, following completion of construction and buildout of the facility.

8. The Debtor has no employees. Its operations consist solely of property management and fulfillment of its obligations as landlord under the lease with PIAP.

## III. THE LEASE ARRANGEMENT AND PAYMENT HISTORY

9. The Debtor and PIAP entered into a triple-net lease agreement for the Property (the "**Lease**"). Under the Lease, PIAP is obligated to pay base monthly rent of $22,000.00, plus all real property taxes, insurance premiums, and common area maintenance costs attributable to the Property (collectively, "**NNN Charges**").

10. In the twelve months preceding the bankruptcy filing, the average monthly rent and NNN Charges paid by PIAP totaled approximately $12,590.00[1]. During the period from May through September 2025, the combined monthly obligations reached approximately $30,216.59.

11. Beginning in October 2025, PIAP ceased making rent and NNN payments to the Debtor. As of the petition date, PIAP owed the Debtor in excess of $250,000 as reflected in Debtor's schedules. On June 1, 2026, PIAP remitted $5,000 to the Debtor as a partial payment toward post-petition rent obligations.

12. Despite my ownership interest in PIAP, I have endeavored to maintain separate accounting between the Debtor's obligations and those of PIAP. The Prosperity Bank construction loan described below is carried as a liability of the Debtor.

## IV. CAPITAL STRUCTURE AND SECURED OBLIGATIONS

13. **Prosperity Bank Loan**. On or about September 7, 2022, the Debtor obtained a construction and term loan from Prosperity Bank in the original principal amount of $1,761,000.00 (the "**Prosperity Loan**"). The Prosperity Loan was subsequently modified on or about April 7, 2023, increasing the principal to $2,073,000.00 (the "**Prosperity Modified Agreement**").

14. Upon information and belief, the Prosperity Modified Agreement bears interest at a fixed rate of 7.75% per annum for the first 60 months, and thereafter at a variable rate equal to the Base Rate plus 0.50% (not to exceed the maximum rate permitted by the Texas Finance Code). For the first 18 months from the modification effective date of April 7, 2023, payments were interest-only at approximately $13,388.00 per month. Beginning in month 19, the loan converted to principal and interest payments of approximately $17,018.00 per month. The Prosperity Loan

[1] Prior to the Petition Date, PIAP remitted debt service, insurance and taxes directly to the payee in lieu of rental payments to the Debtor. Debtor's books and records reflect these payments as credits toward PIAP outstanding rent.

matures on October 7, 2044. As of the petition date, the entire principal balance remained outstanding, together with accrued and unpaid interest from October 2025 through May 2026.

15. PIAP is a co-borrower on the Prosperity Loan. Steve Shoemake and I are personal guarantors of the Prosperity Loan.

16. Prosperity Bank perfected its first-priority security interest in the Property and its proceeds by filing a UCC-1 Financing Statement with the Texas Secretary of State on September 12, 2022 (Filing No. 220045609290)[2]. A second UCC filing by Prosperity Bank (Filing No. 22045609311) was terminated on March 20, 2025. Prosperity Bank holds a first-priority lien[3] on the Debtor's assets, including the Property and rents therefrom.

17. **SBA Loan**. On or about January 23, 2025, the Debtor obtained an SBA 504 loan with the U.S. Small Business Administration in the original principal amount of $1,668,000.00 (the "**SBA Loan**"), evidenced and secured by a promissory note, deed of trust, and related loan documents (collectively, the “**SBA Loan Documents**”).

18. Upon information and belief, the SBA Loan bears interest at a fixed rate of 5.02251% per annum over a 25-year term. Monthly escrow payments total approximately $9,757.91. During years one through five, total monthly payments are approximately $10,953.91; years 11–15, approximately $10,756.44; years 16–20, approximately $10,502.72; and years 21–25, approximately $10,176.74. PIAP is a co-borrower on the SBA Loan, and I am a personal guarantor. The SBA Loan was in default as of the petition date.

[2] The lienholders listed in this motion have filed UCC-1 statements in the Texas Secretary of State records asserting liens. By including the same herein, Rooted does not waive its right to dispute any lien asserted by any alleged lienholder.

[3] By including Prosperity herein, Rooted does not waive its right to dispute any lien asserted by any alleged lienholder.

19. The SBA perfected its security interest in the Property by filing a UCC-1 Financing Statement on October 21, 2024 (Filing No. 24-0056924789)4, which is junior in priority to the Prosperity Bank lien.

20. As of the petition date, the Debtor's total secured debt was approximately $3,742,016.00, consisting of the Prosperity Loan balance of approximately $2,034,115.95, the SBA Loan balance of approximately $1,648,551.14 (plus accrued interest and fees), and unpaid property taxes. Unsecured debt totaled approximately $2,741.00.

## V. EVENTS LEADING TO THE CHAPTER 11 FILING

21. The Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on May 11, 2026. The filing was precipitated by Prosperity Bank's initiation of foreclosure proceedings against the Property.

22. The immediate cause of the Debtor's financial distress was PIAP's cessation of rent payments beginning in October 2025. This rent default arose from a combination of the following factors:

a. PIAP's enrollment grew more slowly than projected following its June 2024 opening, such that the monthly revenue generated by PIAP's childcare operations was insufficient to cover the full $22,000.00 monthly base rent obligation, in addition to PIAP's own operating expenses;

b. Construction and buildout of the Property experienced delays that deferred the commencement of PIAP's operations and revenue generation; and

c. The City of College Station imposed requirements during the construction and permitting process that necessitated additional draws on the Prosperity Bank construction loan, increasing the Debtor's outstanding loan balance and associated debt service obligations beyond initial projections.

[4] The lienholders listed in this motion have filed UCC-1 statements in the Texas Secretary of State records asserting liens. By including the same herein, Rooted does not waive its right to dispute any lien asserted by any alleged lienholder.

23. As a result of PIAP's rent default and the escalating debt service obligations, the Debtor became unable to service its loan obligations to Prosperity Bank and the SBA. Prosperity Bank initiated foreclosure proceedings, which directly prompted the Debtor's Chapter 11 filing.

24. The Debtor intends to market and sell the Property. The Debtor has filed an Application to Employ LKG Realty Advisors and Richard “Rick” Lemons at Docket No. 23.

25. I believe that the Lease is currently at above market rents. I intend to consult with the real estate professionals to determine the appropriate market rent for the Property and, if necessary, seek to modify the Lease with PIAP accordingly. The Debtor is also working with the tenant to devise a payment plan to cure arrearages owed to the Debtor. The collection of the arrears will help fund payments under the plan that the Debtor intends to file.

## VI. NECESSITY FOR USE OF CASH COLLATERAL

26. The Debtor's primary assets consist of the Property and the rents and other proceeds derived therefrom. The rents and proceeds attributable to the Property constitute "cash collateral" as that term is defined in 11 U.S.C. § 363(a), as they are subject to the security interests of Prosperity Bank and the SBA.

27. Without authority to use cash collateral, the Debtor will be unable to pay its ordinary and necessary operating expenses, including property insurance, bank charges, and United States Trustee quarterly fees. The inability to fund these expenses would cause immediate and irreparable harm to the Debtor's estate and its reorganization prospects.

28. I have personally reviewed the proposed 30-day cash collateral budget attached as Exhibit “A” to the Motion (the "**Budget**"). The Budget projects income of $19,967.00 in the second week of the budget period, consisting of $13,137.00 in base rent and $6,830.00 in NNN insurance reimbursement from PIAP. Projected disbursements include the Prosperity Bank adequate

protection payment of $13,137.00, insurance of $6,830.00, UST quarterly fees of $325.00, and bank charges of $30.00. The Budget projects an ending cash balance of approximately $6,645.00 after all disbursements.

29. The Budget reflects a 10% variance allowance per line item, providing reasonable flexibility to address unforeseen fluctuations in operating expenses during the budget period without requiring court approval for every minor deviation.

30. I believe the Budget is realistic and represents the Debtor's best current estimate of cash flow for the applicable period, based on the anticipated receipt of payments from PIAP.

## VII. ADEQUATE PROTECTION

31. As adequate protection for the use of their cash collateral, the Debtor proposes to grant Prosperity Bank and the SBA replacement liens on all post-petition rents, accounts receivable, and other proceeds of the Property, to the same extent, validity, and priority as their respective prepetition liens. These replacement liens will arise automatically as of the petition date and attach to post-petition cash collateral to the extent of any diminution in the value of the secured parties' interests resulting from the Debtor's use of cash collateral.

32. I believe that the replacement liens described above provide Prosperity Bank and the SBA with adequate protection for the Debtor's use of their cash collateral. The Property itself, which serves as the primary collateral for both loans, is being maintained and insured, and the Debtor's continued operations under this Court's supervision are calculated to preserve and ultimately enhance the value of the secured parties' collateral.

## VIII. REORGANIZATION GOALS

33. The Debtor's primary reorganization objective is to maximize value for all creditors through a sale of the Property pursuant to 11 U.S.C. § 363. The Debtor believes a marketed sale

process will generate sufficient proceeds to satisfy the secured claims of Prosperity Bank and the SBA and provide a meaningful recovery to other creditors.

34. Alternatively, if a sale does not materialize on acceptable terms, the Debtor intends to pursue a plan of reorganization premised on lease stabilization, that is, by working with PIAP to resume and regularize rent payments at a level sufficient to service the Debtor's secured debt obligations and fund a confirmable plan.

35. The Debtor's ability to pursue either of these reorganization paths depends upon its ability to use cash collateral to fund the ordinary and necessary costs of maintaining the Property and administering this case during the reorganization period. Without immediate authority to use cash collateral, the estate will suffer immediate and irreparable harm.

## IX. CONCLUSION

36. For all of the foregoing reasons, I respectfully request that this Court grant the Debtor's Motion for Authority to Use Cash Collateral in all respects, authorizing the Debtor to use cash collateral in accordance with the Budget, subject to the adequate protection described above.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 25, 2026.

*Stephanie Shoemake with permission by /s/ Melissa A. Haselden*

________________________________

Stephanie Shoemake
Managing Member
Rooted Enterprise, LLC